IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAURA ANN HARRIS PATTERSON,

                                OPINION AND  ORDER

             Plaintiff,

                                    19-cv-487-bbc

      v.

ANDREW M. SAUL,
Commissioner of Social Security,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Laura Ann Harris Patterson seeks review of a final decision by the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under the Social Security Act.  42 U.S.C. § 405(g).  The administrative law judge hearing the claim concluded that plaintiff had the severe impairments of degenerative disk disease, degenerative joint disease, fibromyalgia and depression, but could still perform work in the national economy.   Plaintiff contends that this conclusion was erroneous and that the administrative law judge erred in a number of respects. After reviewing the briefs and the record, I conclude that the administrative law judge was correct in concluding that plaintiff is capable of performing light work, with certain specified adjustments.

       The following facts are drawn from the administrative record (AR).

## BACKGROUND

Plaintiff was born on October 7, 1967 and was 46 when she alleged she had been disabled since April 26, 2013. She filed a Title II application for a period of disability and disability insurance benefits on August 11, 2015, and a Title XVI application for supplemental security income on May 26, 2016. After these applications were denied initially and on reconsideration, she requested and was granted a hearing before an administrative law judge on May 15, 2018.

In a written decision, the administrative law judge found that plaintiff was not disabled. In making this finding, the administrative law judge followed the five-step sequential evaluation of disability prescribed in 20 C.F.R. § 416.920. At step one, the administrative law judge found that plaintiff had not engaged in substantial gainful activity since April 26, 2013, the alleged onset date of her disability, AR 15; at steps two and three, the administrative law judge found that plaintiff had the severe impairments of degenerative disk disease, degenerative joint disease, fibromyalgia, depression and obesity.

Next, the administrative law judge concluded that none of plaintiff's impairments, whether physical or mental, medically equaled the severity of a listing. Before considering step four, the administrative law judge determined that plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.976(b). She could lift, carry, push or pull up to 20 pounds occasionally and up to 10 pounds frequently, sit, stand or walk (each) 6 hours of an 8-hour workday and frequently reach overhead bilaterally. She would be limited to simple, routine tasks and could exercise sufficient judgment to make simple, work-related decisions. AR 23.

At steps four and five, the administrative law judge found that plaintiff could not perform all of the jobs in the light work category, but could perform representative jobs identified by the vocational expert, including assembler, hand packager and housekeeper/cleaner. According to this expert, at least 174,000 persons nationwide are employed in each of these jobs. AR 31-32.

Plaintiff sought review of the administrative law judge's decision by the Appeals Council, but her request was denied on April 15, 2019. She then filed this lawsuit under 42 U.S.C. § 405(g).

OPINION

Plaintiff contends that the administrative law judge erred in (1) assessing plaintiff's physical residual functional capacity; (2) assessing plaintiff's mental functional capacity; (3) failing to properly evaluate the opinion of treating rheumatologist Housam Sarakbi; and (4) failing to properly evaluate plaintiff's subjective symptoms.

A. Plaintiff's Physical Residual Functional Capacity

On March 15, 2016, non-examining state agency physician Mina Khorshidi, M.D., determined from her review of the medical evidence that plaintiff was capable of performing light work, with specified restrictions. Plaintiff contends that because Dr. Khorshidi never had occasion to revisit her report after it was issued, she could not have known of new evidence that came to light in the subsequent two years, and the administrative law judge should have submitted the medical evidence to be reviewed by an expert. Stage v. Colvin,

812 F.3d 1121, 1125 (7th Cir. 2016) (requiring remand when administrative law judge did not consult physician about new evidence). See also Moreno v. Berryhill, 882 F.3d 722, 728, as amended on reh'g (Apr. 13, 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could changed the reviewing physician's opinion.").

After reviewing the evidence developed after Dr. Khorshidi reached her opinion in this case, I conclude that none of it requires a new review. The medical doctors who saw plaintiff after March 15, 2015 generated new reports that speak for themselves. Where they are thorough and well explained, I have relied upon them; otherwise, I have explained the reasons for not doing so.

1. Degenerative disk and joint disease

When Dr. Khorshidi evaluated plaintiff's degenerative disk and joint disease, she had a number of reports before her, including a review of plaintiff's January 2015 surgery to treat her degenerative disk disease and herniation. A month later, plaintiff was instructed by her doctor that she could participate in such activities as climbing a flight of stairs, walking up a hill and doing heavy household chores. AR 20, citing AR 527.

In September 2016, Dr. Sidney Schulman, M.D., determined that an MRI of plaintiff's left knee showed a "non-displaced patella fracture" that did not require surgery. On October 2016, he reported that plaintiff had normal alignment in her knee and full range of motion, was able to walk well and had no need for an assistive device or for a routine orthopedic followup. AR 20, citing AR 910. Dr. Schulman's progress report paints a

positive picture of plaintiff's recovery from the fracture: she had full range of motion in her left knee, only slight medial tenderness, solid ligaments, strong knee extension, no discomfort in stressing her left hip, no tenderness or range of motion range restriction and only some "uncomfortable stiffness" when she first stood up. Id. This 2016 opinion did not include plaintiff's February 2017 x-ray that Dr. Schulman said showed him that plaintiff's left knee symptoms were "due to the early osteoarthritic changes," that she could expect intermittent good days and bad days and, in the "long-term future," she might end up with elective surgical treatment. Id. Despite the prospects of problems in the future, it was reasonable for the administrative law judge to conclude that, as of early 2017, plaintiff was able to walk well enough to perform light work, as the vocational expert defined it later at plaintiff's administrative hearing.

In September 2016, Dr. Tad Johnson, M.D., reported that plaintiff had a normal neurological examination and had exhibited normal strength and a normal gait for her age. AR 931. In March 2017, a report of plaintiff's stress testing on a treadmill, showed her capable of exercising to 7 metabolic equivalents, which Dr. Thomas Stoiber, M.D., said was average for a woman of her age. AR 885.

In an August 2017 report, Dr. Smith K. Holla, M.D., interpreted an MRI of plaintiff's cervical fusion, saying that it showed "no significant interval change from the previous exam." AR 26, citing AR and 668. According to Dr. Holla, plaintiff had tenderness to palpation along her entire cervical spine, full range of motion with increased pain on extension and twisting, normal motor strength in her upper extremities, normal gait and

intact sensation.   Id.

The record contains imaging of plaintiff's lumbar spine in May 2016, showing degenerative spondylosis with multilevel disease and disk dissection and disk bulging at L4-5 and L5-S1.   AR 870-71.   This evidence was produced after Dr. Khorshidi had written her report.   However, the record contains a February 7, 2018 report by a physical therapist, explaining her work with plaintiff to increase strength and flexibility in her spine and support structures and seeing a good chance for improvement.   AR 1594-96.   Although this report is not from a physician, it is unlikely that a physical therapist would work with a patient who had no prospect of improvement and no ability to exercise.

## 2. Fibromyalgia

Plaintiff saw Dr. Hausam Sarakbi, M.D., in December 2015, thinking that she might have fibromyalgia.   She told the doctor that she was unable to sleep more than three hours a day, had headaches and "not too much irritable bowel syndrome."   AR 616.   The doctor noted tenderness complaints that were consistent with a "fibromyalgia-like distribution."   AR 18 (citing AR 618).   He did not see any swelling in plaintiff's hands or feet and he noted that her joints all had a range of motion within normal limits.   He also detected normal bowel sounds.   Id.

Although Dr. Khorshidi had access to this report from Dr. Sarakbi when she reached her opinion in March 2016 that plaintiff could work, she had no opportunity to read the reports the doctor wrote after plaintiff saw the doctor again in January 2017, a little more

than a year after the first visit she made in December 2015. At that visit, plaintiff had an ultrasound examination, which revealed osteoarthritis in both hands, but no clear evidence of inflammatory arthritis. AR 925. When she came back again in March 2017, AR 945-50, Dr. Sarakbi diagnosed undifferentiated connective tissue disease, as well as fibromyalgia. AR 950. In May 2017, AR 954-60, plaintiff told the doctor she had tried two medicines for fibromyalgia, but both had caused diarrhea, so she had stopped taking them. AR 954. At this meeting, Dr. Sarakbi reported that plaintiff had no joint swelling, AR 958, and no sign of inflammatory arthritis. AR 959. In July 2017, the doctor again found no sign of inflammatory arthritis. AR 970. At an appointment with plaintiff in December 2017, the doctor found "less tender points" and no showing of swelling in plaintiff's hands upon examination. AR 987-93.

Although these visits suggest that plaintiff's health was improving, Dr. Sarakbi filled out a physical residual functional capacity questionnaire in February 2018, in which he wrote that plaintiff had a diagnosis of fibromyalgia and undifferentiated connective tissue disease that was likely to be long term and would interfere with her ability to work on a frequent basis. AR 1195. He noted that plaintiff's symptoms included fatigue, dry mouth, pain, headaches, memory problems and joint swelling. Id. He added that plaintiff's experience of pain or other symptoms would frequently interfere with the concentration and attention she would need to perform even simple work, id., and that plaintiff might miss about "two days," about "three days" or "about four days" as a result of her condition. AR 1197. He left most of the questionnaire blank, indicating that additional explanation was

attached to the questionnaire, id., but no such explanation appears anywhere in the record. Instead, the record shows that the questionnaire is followed immediately by a lengthy report on plaintiff from occupational therapist Heidi Alderman, which was prepared at the request of Dr. Michael Angeline. AR 1198. (It was Dr. Angeline's conclusion that plaintiff could return to work at the medium-duty level with lifting restrictions no greater than 0 to 15 pounds from floor to mid-chest and lifting 0 to 5 pounds above mid-chest level.)

The administrative law judge accepted plaintiff's allegations that she suffered from fibromyalgia, but declined to accept Dr. Sarakbi's assessment that fibromyalgia kept her from performing light work, for three reasons: (1) after plaintiff's first visit to the doctor, she did not return for more than a year; (2) the doctor gave no explanation for his opinions, but merely checked some boxes; and (3) he failed to answer questions asking him to describe plaintiff's ability to perform certain functions, such as sitting, standing, walking, lifting, etc. AR 29.

3. Obesity

At her hearing before the administrative law judge, plaintiff testified that she weighed 325 pounds and was 5'7" tall. AR 42-43. Although that would make her obese, her condition does not meet the requirements of a listing under 20 C.F.R., Subpt. P, App. 1, because she has no other impairment that would meet these requirements. (Obesity alone is no longer considered a "listing level" condition; that is, an impairment that may qualify for disability in and of itself. It was deleted from the Listing of Impairments in 20 C.F.R.,

Subpt. P, App. 1 in 1999, when the Social Security Administration determined that the criteria for obesity in the listing were not appropriate indicators of listing-level severity.)

When Dr. Khorshidi made her findings, she was aware of plaintiff's obesity, but did not find that it would prevent plaintiff from working. Although plaintiff later filled out a questionnaire on December 1, 2017, saying that her weight interfered with her ability to do a sizable range of activities, AR 17, citing AR 277, the administrative law judge found this information at odds with reports that plaintiff had submitted at other times. For example, on September 2, 2015, she had filed a function report saying that she was spending days driving her children to and from school, helping them with homework, preparing meals, caring for pets, shopping and going out to visit family and friends. AR 25. In January 31, 2016, she also reported regular shopping, driving her daughters to school and visiting family. AR 22, citing AR 241-48.

4. Brain surgery

Dr. Khorshidi had access to the reports of plaintiff's May 2015 surgery for a benign meningioma (brain tumor) that displayed no evidence of a metastatic malignancy, AR 645, but she had no access to follow-up reports. Those later reports include one written in July 2017 by a certified physician's assistant, Alyssa Watring, who evaluated plaintiff's status after her 2015 craniotomy and wrote that plaintiff continued to be doing well; her gait was normal; and she had full range of motion, with increased pain on extension and twisting, and normal motor strength. AR 654-55. Watring advised plaintiff to continue walking regularly

for exercise and to continue her normal activities.  Id.  Nothing in Watring's report suggests that plaintiff could not continue to perform the light work Dr. Khorshidi had found her capable of doing.

5.  Left shoulder arthoscopy

In April 2017, Dr. Michael Angeline, M.D., performed a left shoulder arthroscopy on plaintiff, after which he placed some restrictions on her immediately after the surgery; in May, he recommended that she do home-based exercises.  In October 2017, he reviewed a functional capacity evaluation of plaintiff that had been completed earlier, showing that she had full range of motion in her right shoulder and no evidence of gait abnormality.  It was his opinion that plaintiff could function within the medium work level.  AR 29, citing AR 979, 1198-1213.

6.  Neurogenic bladder

At various times, plaintiff has complained of a "neurogenic bladder," a term that refers to a number of urinary conditions in people who lack bladder control because of a problem in the brain, spinal cord or nerves.   https://www.urologyhealth.org/urologic -conditions/neurogenic-bladder (last visited Mar. 30, 2020).  She had an ultrasound on August 30, 2012, AR 308, and a CT scan in July 2014, but neither procedure disclosed problems in her pelvis or abdomen.  AR 454-55.  In April 2014, she saw nurse practitioner Eleanor Rehberg, who noted that plaintiff complained of stress incontinence and had not

done any Kegel exercises for the problem. AR 399. (According to MedlinePlus from the U.S. National Library of Medicine, Kegel exercises can strengthen the muscles under the uterus, bladder and bowel.)

In January 2015, plaintiff told Dr. Garrett McNulty that her bowel and bladder functioning was normal. AR 507. In July 2015, she saw a podiatrist, Dr. Alan Reinicke, D.P.M., and specifically denied any bowel or bladder concerns, including problems with frequency or incontinence. AR 611. When she saw Dr. Reinicke in February 2018, she again denied any changes in her bowel or bladder habits. AR1608.

In May 2016, plaintiff told Dr. Donald Neff, M.D., that she had had urinary incontinence for about a year and it had become more "bothersome" since her brain surgery in May 2015. AR 653. Dr. Neff noted that plaintiff had tried Kegel exercises, but had found the program uncomfortable because of a history of sexual abuse. AR 650-54.

At plaintiff's hearing before the administrative law judge in May 2018, she testified that she had developed gastrointestinal problems in 2017 that caused her to use the bathroom 24 hours a day. (On questioning, she acknowledged that it only felt like 24 hours a day.) She testified that because she could not control her bowel and bladder, she had consulted Dr. Francis Kaveggia. AR 50-51. It appears from Dr. Kaveggia's report, AR 656-60, that he met with plaintiff in June 2017, on referral from Dr. Neff, who had told Kaveggia that he had found no medications that helped plaintiff and she was unwilling to try physical therapy because of her history of abuse. AR 655. Dr. Kaveggia offered plaintiff posterior tibial nerve stimulation, saying that he saw this as having only a 50-50 chance of helping her.

AR 660. In February 2018, Dr. Kaveggia answered just four questions of an extensive questionnaire, saying that plaintiff had urinary frequency; her condition would require some unscheduled breaks during an eight-hour day; she would need ready access to a restroom; and she would likely have good days and bad days. AR 706. He did not answer a question about how often plaintiff would need to urinate, saying the question should be asked of plaintiff.

In February 2018, Dr. Amandeep Kaur, M.D., saw plaintiff at Urgent Care for low back pain she experienced while doing her physical therapy exercises. AR 1613. Plaintiff told him she had no bowel incontinence, but had had urinary incontinence since 2015, with no change in the symptoms. AR 1614. On March 5, 2018, plaintiff saw Dr. Jaymin R. Shah, still complaining of low back pain. She told the doctor that she had trouble sleeping and denied having any bladder or bowel incontinence. AR 1633.

Plaintiff contends that the administrative law judge erred in rejecting her claim that she had a neurogenic bladder that amounted to a severe impairment. Plaintiff did not mention her claims of bowel and bladder problems until May 2016, so, again, Dr. Khorshidi had no chance to consider them. However, is difficult to see them as hindering plaintiff's ability to work, in light of the imaging results that showed no problems, as well as her numerous statements to other doctors, including Dr. Sarakbi in 2017, that she had no serious bowel or bladder problems.

In light of the varying stories that plaintiff gave of her need to use a restroom, her reluctance to try the exercises suggested for her and the availability of pads for incontinence,

it was not an error for the administrative law judge to conclude that plaintiff's allegedly uncontrolled bladder would not prevent her from working eight-hour days. This case is not like <u>Myles v. Astrue</u>, 582 F.3d 672, 676 (7th Cir. 2009), which plaintiff cites, and which was remanded by the court of appeals because the administrative law judge had rejected the plaintiff's claims of needing to use the restroom at frequent intervals. In <u>Myles</u>, the court found that the administrative law judge had ignored evidence that could have supported the plaintiff's claim. In this case, by contrast, the record contains extensive evidence relating to plaintiff's claims of alleged bowel and bladder problems, all of which was considered by the administrative law judge. This evidence included a normal ultrasound of plaintiff's pelvis, a negative CT scan of both her abdomen and pelvis; her telling some doctors that she had normal bowel and bladder functioning and denying any concerns of frequency or incontinence, while telling other doctors that she had urinary frequency or bowel problems or both. It includes as well her unwillingness to employ the Kegel exercises or other forms of physical therapy that were offered her.

Finally, even if plaintiff actually does have problems with urinary incontinence or with her bowels, she has adduced no evidence showing that she could not handle the problem with the use of the pads she says she carries with her at all times. Accordingly, I conclude that she has failed to show that either or both of these alleged problems would keep her from working.

7. Fatigue

Plaintiff listed chronic fatigue as one of the reasons she could not perform full time work. At various times, she has complained of being unable to sleep more than three hours at night; at other times, she has said she spent a significant portion of her day sleeping. On February 2, 2016, she was seen at the Mercy Regional Sleep Disorders Clinic by Dr. Robert Cook, M.D., and found to have obstructive sleep apnea, for which the doctor prescribed a CPAP machine. AR 708. In October 2016, she complained that use of the machine gave her rashes and, for that reason, she used it less often. Id. However, she told Dr. Cook on January 3, 2018, that she slept much better when she used it regularly. AR 723.

8. Headaches

In 2014 and 2016, plaintiff told doctors that she had no headaches; in 2015 and 2017, she told other doctors that she had occasional headaches. She denied having headaches when examined by Dr. Pawl Olszewski in April 2014, AR 412, but when she saw Dr. Patrick Litonjua, M.D., in September 2016, she said she had headaches. AR 807. In a preoperative medical examination before her brain surgery in 2015, she told the doctor that she did not suffer from headaches. AR 507. On June 16, 2015 and January 4, 2017, she told physician's assistant Allysa Watring that she had an occasional mild headache. AR 643 and AR 654. In response to a December 2017 questionnaire, she wrote that she had seven headaches each week and 30 headaches a day. AR 19. She said at that time that she used only over-the-counter ibuprofen and pain pills left over from a prior surgery. AR 278.

After March 2016, Dr. Khorshidi did not have an opportunity to review any reports of plaintiff's headaches, but given the variances in plaintiff's response to questions about her headaches, it is wholly improbable that anything in those later reports would have caused Dr. Khorshidi or any other medical doctor to conclude that plaintiff could not control her headaches and for that reason would be unable to work full-time.

9. Foot pain

Plaintiff saw Dr. Alan Reinicke in September 2015, complaining of persistent left foot pain and difficulty with an ingrown right great toenail. AR 610. She reported having had seven foot surgeries on her right foot. Id. An x-ray revealed only subjectively demineralized bones, mild hammertoe deformities, mild joint and midfoot degenerative changes, mild soft tissue swelling and small to moderate size plantar and Achilles calcaneal spurs. AR 611. The doctor recommended physical therapy for the Achilles calcaneal spurs. AR 612. X-rays taken in 2018 produced similar results: diffusely demineralized bones, no acute fracture, multifocal mild to moderate midfoot degenerative changes, moderate plantar calcaneal spur and mid diffuse soft tissues along [next word missing from report]. AR 1631.

Plaintiff contends that the issue of foot pain must be reviewed by an expert, because of the time that has passed since Dr. Khorshidi reviewed it and no other expert has considered it since then. Stage, 812 F.3d at 1127 (remand is necessary when no doctor or other medical expert has reviewed evidence); Goins v. Colvin, 764 F.3d 680 (7th Cir. 2014)("significant, new, and potentially decisive" medical evidence" requires remand for

evaluation by medical expert). However, plaintiff has not shown that her left foot problem is of significance. In 2015, her treating doctor reviewed the x-rays and did not recommend anything for her other than physical therapy for her Achilles calcaneal spur; in 2018, a different doctor reviewed plaintiff's x-rays of her right foot and made similar findings. AR 1631.

### B. Plaintiff's Mental Residual Functional Capacity

In analyzing plaintiff's mental residual functional capacity, the administrative law judge concluded that plaintiff had no mental problems that met or medically equaled the criteria of Listing 12.04, which requires a showing that the person does not have either one extreme or two marked limitations in a broad area of mental functioning. Plaintiff is not contesting this determination.

The record contains references by plaintiff to depression, but none of the references indicate that she ever received a diagnosis of depression. The administrative law judge noted that a number of doctors had found plaintiff's mood and affect appropriate when they examined her, AR 21, and no doctor had found that she was depressed. In addition, Dr. Sarakbi reported that plaintiff was not taking any medicine for depression. Id.

A number of medical professionals had an opportunity to evaluate plaintiff's mental functioning. For example, Dr. McNulty assessed plaintiff's mood, affect and behavior in advance of surgery in January 2015 and found that she had normal affect and appeared to have appropriate judgment and insight. AR 508. A nurse practitioner reported on

December 2015 that when plaintiff had a mammogram, she had normal mood and affect, no symptoms of anxiety or depression and was alert and fully oriented. AR 21 (citing AR 848-49). Dr. Holla noted that plaintiff had normal mood and affect when examined. AR 21 (citing AR 848-49).

In addition to these reports, Cameron Brewer, Ph.D., undertook a neuropsychologic interview of plaintiff on November 20, 2015, following her brain surgery. He found that she had strengths in executive function, intact language function, variable memory performance, lower than expected mental status and affective function that was notable for mild anxiety and depression. AR 645. In his opinion, there was no evidence to suggest that plaintiff could not carry out her activities of daily living independently. Id.

State psychological consultant, Dr. Lisa Fitzpatrick, Psy.D., concluded in March 2016 that plaintiff had the mental residual functional capacity to understand and remember simple instructions, but would be unable to consistently understand and remember moderately to highly complex and detailed instructions. AR 89. Dr. Fitzpatrick added that plaintiff would have moderate difficulties maintaining concentration, persistence and pace, but would have only mild restrictions in activities of daily living or in maintaining social functioning and no repeated episodes of decompensation. Id.

Although the criteria for maintaining concentration, persistence and pace were revised, effective January 2017, which was after Dr. Fitzpatrick had assessed plaintiff, the administrative law judge explained that Dr. Fitzpatrick's assessment was "consistent with limiting the claimant to moderate limitations under [the] revised criterion," AR 21. (Under

this revision, a "moderate" rating is consistent with the ability to maintain attention and concentration for a sufficient period to sustain work.  It indicates that a person's abilities in a given area are "fair."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d).  Plaintiff was found capable of maintaining attention and concentration for two hours, which according to agency guidance, is sufficient for the rating.  See POMS D1 25020.010(B)(3)).

The court of appeals has explained that a finding that a claimant has moderate limitations in specific areas of mental functioning does not require automatically that specific limitations be incorporated into the residual functional capacity assessment.  Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019).  Instead, the residual functional capacity assessment must "adequately account for the claimant's demonstrated psychological symptoms."  Id.  In this instance, the administrative law judge's mental residual functional capacity assessment is well supported by the medical records, opinion evidence and plaintiff's own reports of her daily activities.

## C. Dr. Sarakbi's Opinion

The administrative law judge declined to adopt Dr. Sarakbi's opinion that plaintiff's fibermyalgia and undifferentiated connective tissue disease would prevent her from working, doing so because of the year's gap in treatment after the doctor had first seen plaintiff and because he had failed to answer most of the questions on the questionnaire he was given. The doctor was asked about plaintiff's abilities to do such things as lift and carry, but instead of answering the questions, he referred to "an attached report."  The record does not include

any "attached report" completed by Dr. Sarakbi. As noted earlier, he simply indicated with check marks that plaintiff would be absent from work on two, three or four days a month, and he provided no explanation for his estimate. Accordingly, the administrative law judge's decision to give little weight to the doctor's opinion was well-supported. (The rules for evaluation of medical evidence have been superseded by revised rules on evaluating medical evidence, but plaintiff's case remains subject to the rules in effect for claims filed before March 27, 2017. 82 Fed. Reg. 5844; 82 Fed. Reg. 15132.)

## D. Evaluation of Plaintiff's Symptoms

The administrative law judge wrote that plaintiff's "statements concerning the intensity, persistence, and limiting effects" of her symptoms "were not entirely consistent" with the evidence in the record." AR 28. Plaintiff calls such a statement "meaningless boilerplate." AR 28, citing Parker v. Astrue, 597 F.3d 20, 929 (7th Cir. 2010) ("It is not only boiler plate, it is meaningless boilerplate . . . and it yields no clue as to what weight the trier of fact gave the testimony."). This critical comment may be true in some cases, but in this instance, it is evident that the administrative law judge was referring to the discrepancies between plaintiff's complaints and the evidence in the medical record, such as the varying and contradictory complaints plaintiff made about her bowel and her bladder or about her headaches. As the administrative law judge observed, Dr. McNulty said that plaintiff "tested positive for anything you ask her for," AR 28, citing AR 1054; and occupational therapist Heidi Alderman reported that plaintiff's ability to stand depended on whether she was being

tested (in which case she could barely stand more than a minute) or whether she was waiting to be tested (in which case she had no trouble standing).  AR 1198.

The administrative law judge also noted the significant differences in plaintiff's September 2, 2015 and November 13, 2015 function reports, in which plaintiff reported widely varying activities.  In the earlier one, plaintiff listed a wide variety of activities in which she engaged with or on behalf of her children, AR 22, citing AR 423; in the second one, compiled just weeks later, she painted an entirely different picture of her situation, saying she needed frequent rest as well as help from her children to do her chores, id., citing AR 422-26.  In a still later report on January 31, 2016, plaintiff largely repeated the report she had filed in September 2015.


CONCLUSION

After reviewing the record at length, I conclude that the administrative law judge made a well-reasoned determination of plaintiff's ability to perform light work, finding that plaintiff would lift/carry/push/pull up to 20 pounds occasionally and up to 10 pounds frequently, sit, stand, or walk (each) 6 hours of an 8-hour workday and frequently reach overhead bilaterally.  She would be limited to simple, routine tasks and could exercise sufficient judgment to make simple, work-related decisions.  AR 23.  Accordingly, judgment will be entered in favor of the commissioner.

ORDER

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security is AFFIRMED and plaintiff Laura Ann Harris Patterson's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 13th day of April, 2020.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge